[Crim. No. 6095. Second Dist., Div. Two. June 26, 1958.]

THE PEOPLE, Respondent, v. JAMES RONALD RICKS, Appellant.

Robert Barnett, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Morris Schachter, Deputy Attorney General, for Respondent.

FOX, P. J.—Defendant was charged with two counts of robbery. He admitted commission of the offenses charged but entered a plea of not guilty by reason of insanity. Also he was charged with and admitted a prior conviction for burglary.

Defendant robbed a store, operated by a Mr. Feldman, and also one of its customers. The robbery took place at approximately 7 p. m. Donald, a son of the proprietor, first noticed defendant at the drug counter while he was waiting on a customer. Defendant was standing there with his hands behind him, holding himself against the case and appeared to be "wobbling." After a couple of minutes he moved over to the frozen food cabinet, which was close by, and put his hands on it. During this latter period of about three minutes his head was moving "in circles." Defendant then started walking around the store with his arms outstretched and his hands

dangling. He stopped at the open air ice box, leaned against it and appeared to be holding on to it while he was looking into it.

After Feldman finished waiting on the customer he heard someone come behind the counter. He turned to face defendant, who was about eight feet away. Defendant pulled a gun and said, "This is a stickup. . . . If you move I will shoot you." From defendant's expression and voice he appeared to be "mad." When defendant walked toward the cash register, Feldman, being frightened, took a step backward, whereupon defendant said, "If you move once more I will kill you." While defendant took the money out of the cash register he held his gun on Feldman. Upon defendant's demand, Feldman tossed his wallet to him. Defendant caught it and "Shoved it in his pocket." Mrs. Spitzer, unaware of what was going on, placed a quart of milk on the counter near defendant. He turned around, pointed his gun at her, and said: "Give me your purse." He grabbed it, admonished her and Feldman to "Give me five minutes before you call" the police, and then ran out of the store. According to Mrs. Spitzer, defendant seemed frightened and had a crying voice.

A police officer testified that when he arrested defendant a few minutes after the robberies he did not appear to be under the influence of intoxicating liquor but he thought defendant might possibly be under the influence of narcotics.

Defendant testified that in the afternoon, prior to the robberies, he had a few drinks and then went to a drug store where he purchased a bottle of Pasitabs, which contain bromides that tend to make one sleepy and depressed. Defendant took three of these tablets for nervousness and tension. This was approximately the middle of the afternoon. The tablets did not seem to do him any good so he went to see his friend, Ray Allen. There he took from six to eight more Pasitabs. Defendant remembered sitting on the bed at his friend's house and that he felt very relaxed. The next thing he remembered was waking up next morning in jail. Defendant further testified that he did not have a gun when he visited his friend, Allen, and did not know where he obtained the gun introduced in evidence, which was the gun he used in committing these robberies.

Defendant was examined by three psychiatrists, who also heard the testimony at the trial. They were unanimous in their opinion that defendant was sane at the time of the commission of the offenses.

On the issue of insanity the court instructed the jury as follows:

"Insanity, as the word is used in these instructions, means such a diseased and deranged condition of mental faculties of a person as to render him incapable of knowing the nature and quality of his act and of distinguishing between right and wrong in relation to the act with which he is charged.

"The test of accountability is this: Did the party have sufficient mental capacity to appreciate the character and quality of the act? Did he know and understand that it was a violation of the rights of another, and in itself wrong? If he had the capacity thus to appreciate the character and to comprehend the probable or possible consequences of his act, he was sane under the law, and is responsible to the law for the act thus committed."

The psychiatrists applied these standards in forming their opinions as to defendant's sanity. The foregoing instruction, sometimes referred to as the "right and wrong" test, correctly states the law in this state. In fact, these principles are firmly imbedded in our jurisprudence. (*People* v. *Sloper*, 198 Cal. 238, 245-246 [244 P. 362]; *People* v. *Kimball*, 5 Cal.2d 608, 610 [55 P.2d 483]; *People* v. *Coleman*, 20 Cal.2d 399, 409 [126 P.2d 349]; *People* v. *Wells*, 33 Cal.2d 330, 351 [202 P.2d 53]; *People* v. *Berry*, 44 Cal.2d 426, 433 [282 P.2d 861].)

██ Defendant, however, makes the unpersuasive contention that the "right and wrong" test is scientifically inadequate and often invalid and irrelevant in determining criminal responsibility. A somewhat similar attack was made on the "right and wrong" test in the Sloper case, *supra.* Specifically, it was there charged that the "right and wrong" test was "antiquated and unscientific." In answer to this challenge the Supreme Court stated: ". . . The rule has the approval of the highest judicial tribunals known to the Anglo-Saxon race, and no reason resting upon experience or known to legal or medical science has been pointed to which would justify the abolition of a test founded upon necessity and approved by experience and which prescribes, with reasonable regard for the frailities and weakness of mankind, the degree, kind and quality of mental incompetency or derangement that must be shown to exist to relieve a person of the consequences of his act which otherwise would be punished as a crime."

In *People* v. *Berry, supra,* defendant contended, as does the defendant at bar, that "the long-established legal stand-

ard of sanity based on the knowledge of 'right and wrong' should be reexamined.'' In the Berry case, the doctors testified that defendant was sane, according to the accepted theory of insanity. He argued, as does the defendant here, that the test should have been whether he was responsible for his actions at the time and not whether he knew right from wrong when he committed the assault. In answering this contention the Supreme Court stated (p. 433) : ''. . . However, regardless of the doubtful merit of defendant's suggestion as a generally workable test, if any change is to be made in the accepted standard for determining criminal guilt in relation to the insanity plea, the arguments for such change should be addressed to the Legislature rather than to the courts. (*People* v. *Daugherty*, 40 Cal.2d 876, 893-894 [256 P.2d 911].)''

 Defendant's final contention is that he was deprived of the effective aid of counsel in violation of his constitutional rights. He bases this argument on the asserted failure of the deputy public defender who represented him at the trial to subpoena Dr. Arnold Levin, and Ray Allen, who was with defendant a few minutes before the robberies. Defendant asserts that Dr. Levin would have testified that he examined defendant just prior to the commission of the offenses and found him not to be a narcotic addict, and that Allen would have testified that defendant was not under the influence of narcotics while they were together. The answer to defendant's contention is succinctly stated in *People* v. *Logan*, 137 Cal.App.2d 331 [290 P.2d 11]. At page 335 the court said : ''But where an accused is represented by counsel and the basis of his claim is that he received poor advice, indicative of poor judgment on the part of his attorney, and acted thereon to his detriment, those facts, even if substantiated, do not amount to a denial of the right of representation. [Citations.]''

 The handling of the defense by counsel will not be declared inadequate except in those rare cases where ''counsel displays such a lack of diligence and competence as to reduce the trial to a 'farce or a sham.' '' (*People* v. *Wein*, 50 Cal. 2d 383, 410 [326 P.2d 457].) There is no pretense of such a showing in this case.

Furthermore, as the trial judge pointed out, the testimony of these witnesses would fortify the People's contention that defendant was in full possession of his faculties when he committed the offenses.

The purported appeal from the verdict is dismissed (*People v. Abrams*, 108 Cal.App.2d 584, 585 [239 P.2d 75].)

The judgment and order are affirmed.

Ashburn, J., and Herndon, J., concurred.